IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KATIE JERKOVICH, | ) | No. CV-F-04-5811 REC DLB |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING DEFENDANTS' |
| | ) | MOTION FOR SUMMARY |
| vs. | ) | JUDGMENT. |
| | ) | |
| FRESNO-MADERA CHAPTER OF | ) | (Doc. 25) |
| AMERICAN RED CROSS; AMERICAN | ) | |
| RED CROSS; and DOES 1-25, | ) | |
| inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

On June 13, 2005, the Court heard Defendants' motion for summary judgment or, in the alternative, partial summary judgment.  Upon due consideration of the written and oral arguments of the parties and the record herein, the motion is GRANTED as set forth below.

**I.  Factual Background**

    **A.  Facts Related to the Chapter & Plaintiff's Position**

In December of 2001, the Fresno-Madera Counties Chapter of the American Red Cross (the "Chapter") hired Plaintiff Katie Jerkovich ("Plaintiff") as a Public Support Specialist.  The

1

position was a full time position in which Plaintiff was expected to work at least 40 hours per week.  The Chapter employed approximately 10 people during the time at issue in this case. The Chapter depends almost entirely on charitable donations for its operating expenses.

Management of the Chapter changed during the course of Plaintiff's employment.  Plaintiff was hired by Gina Greenwood-Meinert, who was then the Chapter's Executive Director.  Ms. Greenwood-Meinert left the Chapter in September of 2002 and was replaced by Ed Webb, who was the interim manager from September 2002 to November 2002.  Mr. Webb was replaced by Jean Hermanson, who was the interim manager from November 2002 to May 2003.  Ms. Hermanson was replaced by Carter Taylor, who was the interim manager from June 2003 to July 2004.  In July 2004, the Chapter hired its current Chief Executive Officer, Ellen Schneider.

In April of 2003, Plaintiff informed the interim manager, Ms. Hermanson, that Plaintiff would be taking a pregnancy leave beginning in June 2003.  On April 18, 2003, Plaintiff presented Ms. Hermanson with a memo regarding Plaintiff's "Maternity Leave and New Schedule."  In this memo, Plaintiff stated:

> Hi Jean,
>
> Please review the following, as this is a tentative schedule for my upcoming maternity leave and new schedule.
>
> At this current time, I am tentatively planning to work full time up to on or about June 20th, 2003.
>
> I will then be on maternity leave and out of the office during the months of July 2003 and August 2003...with

the possibility of being available to work some hours, after August 15, 2003.

My first full day back to work would then be tentatively scheduled to start September 3, 2003 **with my new work schedule being the following:**

**Monday and Wednesday work from 12pm-4pm**

**Tuesday, Thursday and Friday work from 8am-4pm[1]**

Taylor Decl. Ex. A.  (ellipses in original, emphasis added). Both Plaintiff and Ms. Hermanson signed and dated the memo.

Plaintiff began her pregnancy leave in mid-June of 2003, a few days after Ms. Taylor began her role as the Chapter's interim manager.  Prior to her departure, Plaintiff met with Ms. Taylor and gave her a copy of the memo.  Plaintiff and Ms. Taylor did not discuss the new schedule at that time.

**B.  Facts Related to Meetings Re Plaintiff's Return to Work**

On August 27, 2003, Ms. Taylor met with Plaintiff to discuss Plaintiff's return to work.  The Chapter's Accounting / Office Manager, Dona Burson, was also present at this meeting.  After reviewing the memo that Plaintiff had given her, Ms. Taylor determined that, under the terms of the memo, Plaintiff would be working only 29 hours per week.[2]  Defs.' Reply to UMF No. 5; Taylor Decl. ¶¶ 6, 9.  The Chapter provided health insurance

---

[1] Ms. Taylor extended the Chapter's business hours until 5 pm during Plaintiff's pregnancy leave.  Plaintiff requested that her work schedule be altered to 8-5 on three days and 2-5 on two days, but Ms. Taylor declined.  Such schedule would have amounted to 30 hours per week.

[2] This number accounts for a one hour unpaid lunch on Tuesdays, Thursdays and Fridays.

benefits only to full time employees, who are those working 40 hours a week. Ms. Taylor characterized the change in hours as a shift to part-time status and informed Plaintiff at the meeting that due to this change Plaintiff would be ineligible for paid medical benefits. Plaintiff disputes Ms. Taylor's reading of the memo as a request for part-time status and denies that she ever requested such a change.

Ms. Taylor also informed Plaintiff at the August 27 meeting that because her benefits would not be paid by the Chapter, Plaintiff could reimburse the Chapter for the cost of Plaintiff and her family's medical insurance. Ms. Taylor also told Plaintiff, who had brought her baby to the meeting, that the baby could not come to work with Plaintiff because the Chapter did not have a child care facility and did not permit other employees to bring their children to work. Plaintiff disputes that the Chapter did not allow employees to bring their children to work.

Also at the August 27, 2003, meeting, Plaintiff was informed of the creation of a new position within the Chapter, the Chief Development / Public Relations Officer ("CD/PR Officer"). Plaintiff was given a copy of the Chapter's new organizational chart, which indicated that Plaintiff, who had previously reported to the Executive Director, would now report to the CD/PR Officer, who would then report to the Executive Director. Ms. Taylor gave Plaintiff a copy of the CD/PR Officer job description and informed Plaintiff that she could apply for the position.

Ms. Taylor scheduled a second meeting with Plaintiff for

4

September 9 to further discuss her schedule and return from maternity leave.  Before this meeting, Plaintiff submitted a physician's certification extending her pregnancy leave until September 17, 2003.  At the meeting, which Ms. Burson also attended, Ms. Taylor asked Plaintiff to return to work on Monday, September 22, 2003, rather than on Wednesday, September 17, because Ms. Taylor was scheduled to be out of town from September 17-19.  Ms. Taylor also informed Plaintiff that Plaintiff would no longer have an enclosed office due to staffing changes.[3]  Ms. Taylor informed Plaintiff, who was breast-feeding her child, that Plaintiff could use a computer room to privately express breast milk during the day.  Ms. Taylor had arranged for a lock to be put on the computer room door to ensure privacy.  Additionally, Ms. Taylor informed Plaintiff that she would have to bear the costs of her medical insurance as of July 1, 2003.[4]

At the conclusion of the September 9 meeting, Plaintiff presented Ms. Taylor with a list of 23 questions regarding the job duties of the Public Support Specialist and the newly-created CD/PR Officer position.  On September 16, 2003, Ms. Taylor sent a memo answering the questions to Plaintiff's home by overnight

---

[3] Plaintiff disputes Ms. Taylor's assertion that Ms. Taylor told Plaintiff that the move was due to staffing changes, Pl.'s Opp'n to UMF No. 16, however in her declaration, Plaintiff states that Ms. Taylor told Plaintiff that her "office was going to be moved from a private one to the hallway, to make room for the person selected for this newly created position . . .." Jerkovich Decl. ¶ 17.

[4] On September 15, 2003, Plaintiff received a bill for $2,319 to cover her insurance costs from July 1, 2003 to October 31, 2003.

mail.  The memo confirmed that Plaintiff would resume work on
September 22, 2003.  One of Plaintiff's questions was whether the
Public Support Specialist had been changed to an hourly non-
exempt position with no benefits, and, if so, what was the reason
for the change.  Taylor Decl. Ex. E at 1.  Ms. Taylor responded
as follows:

> 5.  The Public Support Specialist is an exempt
> position.  If staffed by a full time Red Cross
> employee, the standard benefit package applies.  In the
> agreement that you signed with Jean Hermanson, Interim
> Executive Director, on 4/18/03, you requested a part-
> time schedule of 29 hours per week.  Part-time
> employees do not receive medical benefits at the
> Fresno-Madera Counties Chapter of the American Red
> Cross.  You do have the option of receiving medical
> coverage providing you reimburse the Chapter for the
> monthly medical premium costs.

Taylor Decl. Ex. F at 1-2.  Plaintiff also asked what the salary
reduction would be if she were to "accept the 'Public Support
Specialist' position as redefined?"  Taylor Decl. Ex. E at 1.
Ms. Taylor replied that the salary for the full time Public
Support Specialist position "is based on a 40 hour work week.  If
you choose a part-time position, the salary will be
proportionately decreased to represent the 29 hour work week."
Taylor Decl. Ex F at 2.

**C.  Facts Related to Plaintiff's Return to Work & Subsequent**
**Communications**

Plaintiff reported for work on September 17 in the early
afternoon.  After having been at the office for approximately an
hour, Ms. Taylor, who had cancelled her trip, appeared and asked
Plaintiff if she had received the memo responding to Plaintiff's

1    questions.  Plaintiff indicated that she had not, and Ms. Taylor

2    told Plaintiff to return home, review the memo and return to work

3    on September 22, as requested by Ms. Taylor.

4         Ms. Taylor emailed Plaintiff on September 18, 2003, to

5    confirm that Plaintiff would report to work on Monday, September

6    22.  Plaintiff responded by email that she did not understand why

7    she could not come to work on the date for which her doctor

8    cleared her and that she was still uncertain as to how her

9    position had changed, including salary and benefits.  Ms. Taylor

10   sent Plaintiff another email on September 20 that included a

11   memorandum explaining that the salary of a 29 hour a week Public

12   Support Specialist would be approximately 3/4 the salary of a

13   full-time Public Support Specialist.  The memo also indicated

14   that "the position remains an exempt position, so you will not

15   receive overtime pay for any hours worked in excess of 29 hours

16   per week.  Of course, should you wish to work full-time, the

17   salary will be restored to $30,000."  Taylor Decl. Ex. I.  The

18   memo further indicated that employees working part-time are not

19   eligible for benefits but those working full time are eligible.

20        Plaintiff sent Ms. Taylor another email on September 22,

21   2003, asserting that all of her questions had not been answered.

22   Ms. Taylor sent an email in reply stating that she had answered

23   Plaintiff's questions and that if Plaintiff did not appear for

24   work that day that Ms. Taylor would assume that Plaintiff had

25   resigned her position as Public Support Specialist.

26        Plaintiff did not appear for work on September 22.  By

7

letter dated September 23, 2003, Ms. Taylor informed Plaintiff
that her actions had prompted the Chapter to conclude that
Plaintiff had resigned her position.  The letter also indicated
that the Chapter would consider Plaintiff's application for the
CD/PR Officer position.

**D.  Facts Related to the CD/PR Position**

During her tenure as interim manager, Ms. Taylor determined
that the Chapter was in debt and that its operating expenses were
exceeding its incoming revenue; the Chapter had a deficit of
almost $350,000.  To improve the financial condition of the
Chapter, Ms. Taylor obtained a $250,000 loan from the national
organization and developed the new CD/PR Officer position.
Plaintiff disputes Ms. Taylor's motivation for creating the new
position.

**1.  The Job Descriptions**

The Public Support Specialist position is focused on
increasing public support for the delivery of disaster relief
services by the Chapter "through increased fund raising,
marketing and public affairs activities."  Taylor Decl. Ex. C.
The responsibilities and requirements listed on the job
description given to Plaintiff are:

> [W]orking with an outside vendor to expand the direct
> marketing program; highlighting disaster services in
> marketing, volunteer recruitment and fund-raising
> activities; serving as the lead public affairs officer
> for disaster incidents; organizing special events to
> cultivate donors, recruit volunteers and increase
> community awareness of the local Chapter; soliciting
> corporate and business sponsors for Red Cross events
> and activities; coordinating media relations;

8

marketing, public speaking and communicating Chapter
activities to the community.

Id.  The qualifications are listed as a bachelor's degree or a
combination of college and work experience and 2-3 years of
experience in a relevant field.  Id.  Prior fund raising
experience is desired, as is experience working with donors.  The
"essential responsibilities" are:

- Manage direct mail program with out-of-house vendor

- Monitor donor data base and grow existing donors

- Coordinate the donor acknowledgment process

- Expand the donor base and grow existing donors

- Assist with the organization of donor cultivation, volunteer recruitment, community awareness and fund-raising events

- Secure sponsorships for special events and programs

- Prepare reports as required for local, regional or national Red Cross purposes

- Identify and take advantage of community events and opportunities to solicit public support for the Red Cross, particularly regarding disaster services

- Serve as chief public affairs officer during disaster situations

- This position and one other are grant funded initially.  Funding will decrease in increments. Consequently, this position, at a minimum, must generate additional income to fund the two positions within two years.  Additional funds neede[d] to sustain the positions is estimated to be $70,000.  This estimate could change as conditions change.

- The duties listed in this job description may be

9

1      modified as a result of future organizational
       changes.  These duties are not the only duties to
2      be performed by the employee occupying this
       position.  The employee will be required to follow
3      any other job-related duties as requested by the
       Executive Director.

4

5   Id.

6      The CD/PR Officer position is focused on resource

7   development.  The qualifications are listed as a bachelor's

8   degree, a minimum of five years of leadership in fund-raising and

9   public relations, bilingual ability in English and Spanish,

10  excellent written and verbal communication skills, and a minimum

11  of three years management experience.  The duties are:

12     Directly responsible for comprehensive resource
       development program for American Red Cross.  Will
13     manage and participate in aggressive annual giving
       program, including major gifts, personal, foundation,
14     corporate and in-kind solicitation programs.  Develops
       and meets goals and objectives for short and long range
15     fund raising programs.  Supervise public information
       program to compliment fund-raising activities and
16     promote agency image throughout community.  Interprets
       Red Cross policies, programs and services to the
17     public.

18  Taylor Decl. Ex. L.  The specific functions of the position as

19  listed on the job description are:

20     •   Responsible for overall administration and management
           of the Financial Development / Public Relations
21         Department.

22     •   Responsible for the hiring, training, supervision,
           evaluation and development of employed staff.
23
       •   Responsible for the development and management of
24         the department budget.

25     •   Develops and implements an annual and three year
           fund raising plan, approved by the Chapter Board
26         of Directors, that maintains a sound financial

                                10

position sufficient to meet Chapter, National and
Community needs/requirements.

- Works closely with the Financial Development
  Committee and sub-committees to plan and implement
  a resource development program based on
  cultivation and solicitation of gifts by committee
  members and other volunteers.

- Oversees and implements a comprehensive public
  relations marketing and communications program.

- Develops an effective publications program to
  promote corporate image.

- Conducts business and acts in a manner that
  minimizes risk to the Chapter and National and
  promotes a safe and healthful work environment.

- Responsible for recruitment, supervision and
  development of volunteer staff.

- Perform other duties as required.

Id.

### 2.   The Application & Selection Process

Ms. Taylor solicited and received applications for the CD/PR

Officer position.  Tom Jones, a management consultant, assisted

Ms. Taylor with the interview process.  Forty-four applications

were reviewed and several interviews were conducted by Mr. Jones

and Ms. Taylor.  The position was offered to Hilda Martinez on

October 20, 2003.

Ms. Martinez's qualifications include a Master of Journalism

degree from the University of California at Berkeley and a

Bachelor of Arts degree, *cum laude*, from Harvard University.

Taylor Decl. Ex. M.  Ms. Martinez had six years of experience in

public relations, had worked as an Associate Producer at NBC

Network News and had experience managing employed staff and

11

developing public relations and marketing plans.  She is also
fluent in Spanish.  Id.  Ms. Martinez is of child-bearing age and
has pre-school aged children.  Taylor Decl. ¶ 26.

Plaintiff was interviewed for the position but was not
selected.  Plaintiff's qualifications include a Bachelor of Arts
degree from California State University at Fresno and
approximately two years of experience in public relations and
fund raising.  Taylor Decl. Ex. N.  Plaintiff is not fluent in
Spanish and has not had any management experience.

**D.  Facts Relevant to Discriminatory Animus**

It is undisputed that "[d]uring her employment Ms. Jerkovich
never heard any derogatory or negative comments concerning
pregnant women."  Defs.' UMF No. 28.  There is also no evidence
that any employee of the Chapter ever heard such comments.

According to Plaintiff, in the course of discussing what Ms.
Taylor characterized as Plaintiff's request for a shift to part-
time status at the August 27 meeting, Ms. Taylor suggested to
Plaintiff that Plaintiff possibly "did not wish to return to work
at Red Cross at all."  Jerkovich Decl. ¶ 10.  Ms. Burson
testified that Ms. Taylor mentioned that she hoped Plaintiff
would want to stay home and be a full time mother.  Burson Depo.
98:11-18; Burson Decl. ¶ 7.

Plaintiff also avers that at the September 9 meeting, Ms.
Taylor asked Plaintiff whether she was "really interested in the
Chapter activities" because "it just seems to me that you aren't
very interested in what's been going on around here for the last

12

two months." Jerkovich Decl. ¶12. Ms. Burson avers that Ms. Taylor was "angry with Katie, because she had not called in more to find out how the Chapter was doing while she was on maternity leave." Burson Decl. ¶ 11. Ms. Burson also testified that Ms. Taylor complained of being "frustrated" over Plaintiff's being "too exuberant" and speaking "too loudly" in the office and that Plaintiff's dress was "unprofessional." Burson Depo. 103:17-104:06.

According to Ms. Burson, Ms. Taylor "did not want Katie to return from her maternity leave, whether it was on a part-time basis or a full time basis. She made many comments to me directly, and in private, to the effect that she hoped that Katie did not return, and if she insisted on returning part-time, [Ms. Taylor] would make [Katie's] life so miserable that [Katie] would leave." Burson Decl. ¶ 11. Ms. Burson also asserts that Ms. Taylor was "at odds with Katie, because Katie insisted on not returning part-time." Burson Decl. ¶ 11. Plaintiff argues that Ms. Taylor did not want Plaintiff to return to the office because Ms. Taylor "most likely believed Ms. Jerkovich would be too busy with her child . . .." Pl.'s Opp'n at 11.

**II.  Procedural History**

Plaintiff filed her complaint on March 15, 2004 in the Superior Court of Fresno County. Defendants removed the case to federal court asserting jurisdiction based on 36 U.S.C. § 300105. Section 300105(a)(5) grants original jurisdiction in any case in which the American Red Cross or its units are parties. See

13

1  <u>American Red Cross v. S.G and A.E</u>, 505 U.S. 247, 248, 112 S. Ct.

2  2465, 120 L. Ed. 2d 201 (1992).

3      Plaintiff's complaint states four causes of action.  Claims

4  one through three allege violations of California's Fair

5  Employment and Housing Act ("FEHA"), Cal. Govt. Code § 12940 *et*

6  *seq.*.  In claim one Plaintiff alleges that Defendants failed to

7  reinstate her to her prior position and that Plaintiff was

8  constructively terminated in violation of section 12945(b).[5]  In

9  claim two Plaintiff alleges that she was discriminated against

10  and demoted because of her pregnancy and constructively

11  terminated in violation of section 12945(a).  In claim three

12  Plaintiff alleges that she was both discriminated and retaliated

13  against by the Chapter's failing to hire her for the CD/PR

14  Officer position.  In claim four Plaintiff alleges a common law

15  claim for termination in violation of public policy.

16  **III.  Legal Standard**

17      Summary judgment is proper when it is shown that there

18  exists "no genuine issue as to any material fact and that the

19  moving party is entitled to judgment as a matter of law."  Fed.

20  R. Civ. P. 56.  A fact is "material" if it is relevant to an

21  element of a claim or a defense, the existence of which may

---

23      [5] Government Code section 12945, which governs pregnancy-
24  related claims, was amended after Plaintiff filed her complaint.
   Defendants construe some of Plaintiff's claims as though alleged
   under the statute as amended.  Plaintiff pointed out that she is
25  not alleging that the Chapter failed to accommodate her as required
   under the amended statute; Defendants' argument regarding that
26  issue is irrelevant and has been omitted.

affect the outcome of the suit.  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)). Materiality is determined by the substantive law governing a claim or a defense.  Id.  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  Id.

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  T.W. Elec., 809 F.2d at 630.

The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial."  Id. (citing Fed. R. Civ. P. 56(e)).  The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint."  Id. (citing First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)).  "Conclusory allegations unsupported by factual

1  data will not create a triable issue of fact." <u>Marks v. United</u>

2  <u>States</u>, 578 F.2d 261, 263 (9th Cir. 1978).

3       The question for the Court is not whether the "evidence

4  unmistakably favors one side or the other, but whether a fair-

5  minded jury could return a verdict for the plaintiff on the

6  evidence presented." <u>United States ex rel. Anderson v. N.</u>

7  <u>Telecom, Inc.</u>, 52 F.3d 810, 815 (9th Cir. 1996).  This requires

8  more than the "mere existence of a scintilla of evidence in

9  support of the plaintiff's position;" there must be "evidence on

10 which the jury could reasonably find for the plaintiff." <u>Id.</u>

11 "If the facts make a claim implausible, the nonmovant must

12 present more persuasive evidence than would otherwise be

13 necessary in order to defeat a summary judgment motion." <u>Id.</u>

14 **IV.  Discussion**

15      **A.  Resolution of Certain Factual Disputes**

16      Plaintiff's claims involve some of the same disputed facts.

17 To avoid redundancy, these disputes will be addressed separately

18 rather than within the discussion of the individual claims.

19           **1.  Construction of the Memo**

20      Defendants argue that Plaintiff "requested that her 'new

21 work schedule' be part-time upon her return" from pregnancy leave

22 and that "Ms. Jerkovich and Ms. Hermanson agreed in writing that

23 Ms. Jerkovich would work these reduced hours upon her return from

24 pregnancy leave." Defs.' UMF Nos. 5-6.  Defendants argue that

25 the change in Plaintiff's status from a full time employee who

26 was eligible to receive paid medical benefits to a part-time

16

employee who was not so eligible was the result of Plaintiff's request.  Defendants assert that Ms. Taylor properly and permissibly interpreted the language of the memo to mean that Plaintiff would begin working 29 hours per week upon her return from pregnancy leave.  Such a schedule is not full time under Red Cross standards, so it was proper for Ms. Taylor to characterize the change as one to part-time employment.

Plaintiff argues in response she never requested working part-time and that the memo represented a "flexible" full-time schedule that would permit Plaintiff to work reduced hours in the office.  Pl.'s Opp'n to UMF Nos. 5-7; Jerkovich Decl. ¶ 7. Plaintiff avers that the memo "documented the substance" of her conversation with Ms. Hermanson and reflects Plaintiff's "in-office availability" upon her return from maternity leave. Jerkovich Decl. ¶ 7.  Plaintiff asserts that her "customary additional work hours were at night, early mornings, weekends (i.e., breakfast club presentations), and would significantly exceed a forty hour work week."  Id.

Plaintiff's assertion that this memo represents her "in-office" schedule is unsupported by the plain language of the memo.  The memo, as mentioned, was signed by both Ms. Hermanson and Plaintiff.  It indicates that Plaintiff's "new work schedule" upon her return from pregnancy leave would be that Plaintiff would "work" from 12-4 on Mondays and Wednesdays and from 8-4 on Tuesdays, Thursdays and Fridays.  Although the memo represents the "substance" of Plaintiff's conversation with Ms. Hermanson

17

yet it does nothing except set forth "work" hours.  It does not distinguish between "in-office work hours" and "out of office work hours" or explain how or when Plaintiff was to work out of the office.  It uses the unambiguous term "work."

Plaintiff's contention that she had arranged to work some hours from home is also unsupported by any external evidence, such as Red Cross policy allowing employees to work from home[6] or a definitive statement from Plaintiff that there was an agreement between Ms. Hermanson and Plaintiff that Plaintiff would work from home certain hours.  Plaintiff testified that she "understood [the memo] to be my in-office hours, and *I believe Jean Hermanson understood it as such as well*."[7]  Jerkovich Depo. 103:6-8 (emphasis added).  Plaintiff also testified that "there wasn't a discussion about the hours I would keep, because I kept hours outside the office all the time."  Id. at 103:22-24.

Plaintiff's self-serving testimony regarding the intent of the memo is without evidentiary support.  It is insufficient to create a genuine issue of material fact.  See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (stating that courts may refuse to find genuine issue of fact "where the only evidence presented is 'uncorroborated and self-serving testimony'").

---

[6]  Ms. Taylor testified that the Chapter did not have anyone working from home.  Taylor Depo. 129:12-13.

[7]  Absent from either parties' evidence is any testimony from Ms. Hermanson, although she is listed as a potential witness for Defendants on the parties' joint pretrial statement.  Doc. 43 at 12.

1    Accordingly, Defendants' assertion that Plaintiff requested
2  a "new work schedule" upon her return from pregnancy leave that
3  was a part-time schedule of 29 hours per week is documented in
4  the memo and is undisputed.  The memo indicates that it was
5  intended to set forth Plaintiff's "new work schedule;" there is
6  no evidence indicating that the intent of the memo was to set
7  forth an "in-office" or "flexible" schedule.

8             **2.  Plaintiff's Intent Regarding the Memo**

9    While the *intent of the memo* can be garnered from its face,
10 it does appear that Plaintiff neither realized nor intended that
11 the 29 hours per week schedule set forth in the memo would result
12 in a change in her employment status.  Pl.'s Opp'n to UMF Nos. 7-
13 8.  Plaintiff's intent regarding the memo, however, is not
14 material to the issues in this case because there is no evidence
15 that this intent was ever communicated to Ms. Hermanson, Ms.
16 Burson, Ms. Taylor or anyone else who might have knowledge of the
17 arrangement.  Plaintiff acknowledges that she did not clearly
18 indicate to Ms. Taylor at either the August 27 or September 9
19 meeting that she wanted to return full time.  Jerkovich Depo.
20 130:14-20; 143:18-22.

21   Plaintiff attempts to contradict her own testimony with the
22 declaration of Ms. Burson, the Chapter's Accounting Officer who
23 was also present at the meetings.  Ms. Burson avers that,
24 contrary to Plaintiff's testimony, Plaintiff told Ms. Taylor at
25 both meetings that Plaintiff was planning on returning to work
26 full time.  Burson Decl. ¶¶ 9, 10.  However, Ms. Burson testified

in her deposition that she did not recall everything that was discussed at the meetings and only recalled a discussion of Plaintiff's duties.  Burson Depo. 47:8-9; 48:4-5.  By "duties," Ms. Burson was referring to what Plaintiff "would be responsible for, and what she had done before."  Id. at 47:18-19.  Ms. Burson acknowledged that she was "more interested in watching [Plaintiff's] baby" at the August 27 meeting.  Burson Depo. 47:14-15.

"As a general rule, an affidavit submitted in response to a motion for summary judgment which contradicts earlier sworn testimony without explanation of the difference does not automatically create a genuine issue of fact."  Scamihorn v. Gen. Truck Drivers, Local 952, 282 F.3d 1078, 1086 (9th Cir. 2002) (citing Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991)); see also Schwarzer, Tashima, Wagstaffe, Cal. Prac. Guide: Fed. Civ. Pro. Before Trial 14:166 at 14-60 (The Rutter Group 2004) ("A party cannot create an issue of fact by a declaration contradicting his or her own deposition or other sworn testimony").  Ms. Burson's declaration does not explain her refreshed recollection of what took place at the meetings.  Even considering Ms. Burson's assertion, it does not negate Plaintiff's own testimony that she did not specifically mention full time versus part-time status.  Thus while Plaintiff's assertion that she did not intend the 29 hour per week schedule proposed in the memo to effect a change in her job status will be be viewed in the light most favorable to Plaintiff, any dispute

as to this issue does not create an issue of material fact.

### 3. The Public Support Specialist Position as Identical to the CD/PR Officer Position

#### a) Intention Behind the Creation of the Position

Ms. Taylor testified that she "created the CD/PR Officer position with the goal of hiring someone who would be capable of developing successful fund development and marketing plans and supporting strategies to immediately improve the financial condition of the Chapter." Defs.' UMF No. 31. As mentioned, the Chapter was significantly in debt and Ms. Taylor had obtained a loan from the national organization.

Plaintiff disputes Ms. Taylor's motivation as follows: "Ms. Taylor in fact did not hire somebody with fund raising experience, and little public relations experience, which suggests that improving the financial condition was not her goal. She intended to hire somebody to do what Ms. Jerkovich has been doing all along." Pl.'s Opp'n to UMF No. 31.

As an initial matter, Plaintiff presents no evidence to support her suggestion that Ms. Martinez has "little public relations experience." To the contrary, her resume indicates that Ms. Martinez has been a Public Relations Associate, a Public Relations Consultant and an Account Supervisor. Taylor Decl. Ex. M. All three positions involved public relations for a total of six years of experience in the field. Plaintiff is correct that, according to her resume, none of Ms. Martinez's prior positions involved fund raising. The lack of specific experience does not,

1  without more, create a genuine issue of fact as to Ms. Taylor's

2  motivation.

3      Plaintiff supports her dispute as to Ms. Taylor's goal in

4  creating the CD/PR Position with the testimony of Ms. Burson.

5      Q.  Was it your understanding that the chief financial
        development public relations officer position was
6      created to improve the financial condition of the
       chapter?

7
       A.  I believe that that's probably what Carter [Taylor]
8      intended, even though we had an individual that was
       doing the job or had been doing the job already.  I saw
9      no need to create another position, but I will take it
       one step further.  If that's what she had in mind, why
10     did she hire somebody that had absolutely no fund-
       raising experience, nor PR experience, other than
11     working for a campaign or for an ad agency.  If that
       was her purpose, then why did she hire the individual
12     she hired, that's my opinion.

13  Burson Depo. 152:8-25; 153:1-3 (emphasis added).  This testimony

14  is not evidence that Ms. Taylor had an ulterior motive in

15  creating the position.  Putting aside for a moment that Ms.

16  Burson acknowledges that Ms. Taylor "probably . . . intended" to

17  improve the Chapter's financial condition by creating the CD/PR

18  Officer position, Ms. Burson's further offering regarding Ms.

19  Taylor's reason is, as she acknowledges, her opinion and a

20  rhetorical question, not fact.  Defendants properly object to

21  this evidence as conclusory and lacking in factual foundation.

22  Moreover, nothing on the record indicates that Ms. Burson was in

23  a position to determine the Chapter's hiring needs or that she

24  was involved in developing strategy to relieve the Chapter of its

25  debts; Ms. Burson testified that she did not have any role in the

26  creation of the job description for the "chief financial officer

1 [CD/PR Officer] position."  Burson Depo. 129:24-25, 130:1.

2     Accordingly, Defendants' assertion that Ms. Taylor's goal in

3 creating the CD/PR Officer position was to improve the Chapter's

4 financial situation is undisputed.

5                    **b) Duties**

6     A component common to all of Plaintiff's claims is that the

7 Public Support Specialist position and the CD/PR Officer position

8 are the same.  Plaintiff argues that prior to her pregnancy leave

9 she had been performing all of the functions of the CD/PR Officer

10 position, that the new position stripped Plaintiff of her

11 responsibilities and that Plaintiff was demoted because the CD/PR

12 Officer was to supervise the Public Support Specialist.

13     Defendants argue that there is no genuine issue of material

14 fact because the two positions are dissimilar.  Defendants are

15 correct that, according to the two job descriptions, the

16 positions are different.  The CD/PR Officer appears to be a high-

17 level management position focused on strategic planning, long-

18 term goals, and overseeing development.  In contrast, the Public

19 Support Specialist appears to be a non-managerial role that is

20 more of a hands-on position focused on the actual implementation

21 and running of programs.  Additionally, while the upper

22 management level CD/PR Officer position requires a college

23 degree, the lower level Public Support Specialist may be hired

24 with either a college degree or equivalent experience.

25     That the job descriptions indicate some similarity of duties

26 between the Public Support Specialist position and the CD/PR

23

Officer position does not create a genuine issue of material fact.  Similarity is to be expected of two positions within the same department; there is sufficient differentiation in the job descriptions for the burden to shift to Plaintiff to demonstrate a genuine issue of fact as to this issue.

Plaintiff argues that the fact that Ms. Martinez "took over all the duties and responsibilities Katie Jerkovich had previously been doing" after Ms. Martinez was hired is evidence that the new position was meant to replace Plaintiff's position. Pl.'s Statement of Disputed Facts ("SDF") No. 6.  Defendants acknowledge that initially Ms. Martinez handled Plaintiff's duties as well as her own, but point out that a person was hired to replace Plaintiff in the Public Support Specialist position in February of 2004.  Taylor Depo. 236:25-238:14.  That one member of a department temporarily carried the weight of another does not create a genuine issue of material fact as to the similarity of the positions.

Plaintiff also argues that her job duties had expanded and she was "often referred to as 'Public Relations/Marketing Director.'"  Plaintiff supports the latter assertion with a performance review given of her by Ed Webb, who was the interim director for a few months in 2002.  Pl.'s Opp'n to UMF No. 4.  He listed Plaintiff's title as "Public Relations/Marketing Director" on the review.  Jerkovich Decl. Ex. C.  In his declaration, Mr. Webb avers that the title was a "misstatement" and that he had no intention of changing Plaintiff's job title or position.  Webb

1  Decl. ¶ 4.  Plaintiff's assertion is unsupported by the record;

2  it is undisputed that the Chapter hired Plaintiff as a "Public

3  Support Specialist" and that Plaintiff's job title did not

4  change.  Defs.' Reply to UMF No. 4.

5      Plaintiff supports the former assertion - that her duties

6  had expanded - with a memo Plaintiff prepared for Ms. Taylor

7  prior to the start of her pregnancy leave and with the

8  performance review given by Mr. Webb, the substance of which came

9  from a document supplied by Plaintiff.  Jerkovich Depo. 90:1424.

10 To summarize, Plaintiff's self reporting of her duties and

11 accomplishments includes the following: "schedule, plan and

12 organize all fund raising events," including five events in 2002

13 and four events in 2003; securing sponsorships for events;

14 "manage and maintain the Direct Mail Program," including cost

15 cutting; sending out letters to 150 area companies as part of the

16 "Major Gift Campaign;" upgrading and maintaining the in-house

17 donor database; acting as a media relations spokesperson;

18 speaking to community organizations; and improving public

19 awareness of Chapter activities and services.  Jerkovich Decl.

20 Ex. C; Taylor Decl. Ex. B.

21     These duties are within the purview of the Public Support

22 Specialist job description.[8]  The description, quoted <u>supra</u>,

23

24     [8]  Even if the duties were not within the Public Support
   Specialist job description, the description specifies that the
   duties listed "may be modified as a result of future organizational

25 changes.  These duties are not the only duties to be performed by
   the employee occupying this position.  The employee will be

26 required to follow any other job-related duties as requested by the

1  includes managing the direct mail program, organizing and

2  assisting with fund raising events, and soliciting public support

3  for the Red Cross, as well as requiring that funds be generated

4  to maintain the position.  In contrast, the CD/PR Officer is

5  responsible for a number of things that Plaintiff has presented

6  no evidence that she did including, *inter alia*, hiring, training,

7  supervising and evaluating employed staff; development and

8  management of the department budget; and the development and

9  implementation of a three-year fund raising plan.

10      Plaintiff also cites the testimony of Ms. Burson in support

11  of her position.  Ms. Burson testified that it was "apparent" to

12  her that Ms. Taylor had a "different agenda" regarding the

13  creation of the CD/PR Officer position.  This "agenda" was

14  "hiring somebody to do what Katie had been doing all along, and

15  not utilizing her at all."   Burson Depo. 111:2-6.

16      Defendants properly object to this testimony as Ms. Burson's

17  unsupported opinion and a conclusory allegation, which will not

18  carry Plaintiff's burden. See Marks, supra, 578 F.2d at 263.  Ms.

19  Burson impression does not recount anything Ms. Taylor did or

20  said that indicated that she did not intend to utilize Plaintiff

21  in the Chapter.

22      Accordingly, Defendants have shown by admissible evidence

23  that the CD/PR Officer position and the Public Support Specialist

24  position were separate and distinct positions.  The two positions

25  _____

26  Executive Director."  Taylor Decl. Ex. C.

1  are within the same department and share the overall goals of

2  promoting the Chapter through marketing and improving its

3  financial situation, but their individual duties and

4  responsibilities, as set forth in the job descriptions, are

5  different.  Plaintiff has failed to present admissible evidence

6  from which a trier of fact could find to the contrary.  It is

7  thus undisputed that the Public Support Specialist position

8  differed from the CD/PR Position and that the position Plaintiff

9  occupied prior to her pregnancy leave was the former.

10  **B.  Claim One - Refusal to Reinstate / FEHA Violation**

11  Plaintiff's first cause of action alleges that Defendants

12  violated Plaintiff's right to pregnancy leave by refusing to

13  reinstate her within the time required by law.  Section 12945(a)

14  provides, in pertinent part, that:

15  > [I]t shall be an unlawful employment practice . . . (a)
    > For an employer to refuse to allow a female employee
16  > disabled by pregnancy, childbirth, or related medical
    > conditions to take leave . . . and thereafter return to
17  > work as set forth in the commission's regulations.

18  Cal. Govt. Code § 12945(a).  Plaintiff also alleges that the

19  changes made by Defendants amounted to a constructive discharge.

20  The regulations provide that a person taking pregnancy leave

21  must be returned to the same or comparable position.[9]  Plaintiff

22  argues that the change in hours, salary and benefits as well as

23  the hiring of the CD/PR Officer altered her former position such

24  _____

25  [9]   Section 7291.9(c)(A) provides that an employee can be
    reinstated to a comparable position if the employer made the change
    "for legitimate business reasons unrelated to the employee taking
26  a pregnancy disability leave."  2 Cal. Code Regs. 7291.9(c)(A).

that she was not reinstated to her pre-pregnancy leave position.

### 1. Refusal to Reinstate to the Same or Comparable Position

#### a) Did Defendants Refuse to Reinstate Plaintiff Based on the Change in Hours, Salary & Benefits?

As discussed, the memo bearing Plaintiff's signature represents a 29-hour work week.  Also as mentioned, Red Cross policy provides paid benefits to those employees working full time, which is defined as 40 hours per week.  Taylor Decl. ¶ 9, Ex. D1.  The change in Plaintiff's eligibility for paid benefits and the change in salary were dictated by the change in Plaintiff's schedule.  Neither change was unreasonable; both were the direct result of Plaintiff's own request.  That Plaintiff did not realize the ramifications of her "new work schedule" is irrelevant to the issue of whether she was properly reinstated.

Even if it were assumed that the change in hours, salary and benefits did alter Plaintiff's position, it remains undisputed that Ms. Taylor communicated to Plaintiff in the September 20, 2003 email message that Plaintiff could return to work full time and receive both the full salary and the paid medical benefits to which only full time Red Cross employees were entitled.  Plaintiff argues that this offer "was not a bona fide offer made with the intention of full reinstatement" because the email concludes with the statement that the Chapter looked forward to Plaintiff's return "on Monday, September 22, 2003 with the schedule you requested prior to your maternity leave."  Pl.'s

28

1   Opp'n at 8.   Plaintiff argues that "[c]learly, the message [Ms.

2   Taylor] intends to deliver is that if Ms. Jerkovich insists on

3   returning, it will be part-time only."   Id.

4        There is no evidence offered by Plaintiff from which a trier

5   of fact could reasonably conclude that the offer by Ms. Taylor

6   was not "bona fide."   That Ms. Taylor referenced the schedule

7   that Plaintiff herself had proposed prior to her leave does not,

8   without more, indicate that the offer was invalid.   The offer is

9   fatal to Plaintiff's argument that Defendants refused to

10  reinstate her.   Plaintiff has cited no case law stating that the

11  reinstatement must be made at any particular time prior to the

12  employee's return to work.   Here, prior to Plaintiff's scheduled

13  return to work on September 22,[10] Defendants assured her of her

14  right to return to her former position with full salary and

15  benefits.   This is sufficient.

16       The requested change in hours was reasonably construed as a

17  request for a change to less than full time status.   The

18  accompanying changes in compensation and benefits did not alter

19  Plaintiff's position from what it had been prior to her leave.[11]

20  Even if such alteration had occurred, it is undisputed that

21

22       [10]   The timeliness of Plaintiff's reinstatement will be
    discussed infra.
23       [11]   The memo specified that the new schedule would become
    effective on Plaintiff's return to work, not before her leave.   To
24  that end, it appears that the Chapter's request that Plaintiff pay
    for her health benefits during her leave was inappropriate.   Any
25  changes to Plaintiff's work status were not effective until her
    return. There is, however, no allegation that Plaintiff actually
26  paid the $2,319.

Plaintiff was offered reinstatement to her former hours, salary and benefits.

**b)   Did Defendants Refuse to Reinstate Plaintiff Based on the Change in Duties**?

Plaintiff argues that the Public Support Specialist position was so altered by the development of the CD/PR Officer position that it ceased to be the position she had prior to her pregnancy leave.  Plaintiff also alleges that because the CD/PR Officer was to be Plaintiff's immediate supervisor, Plaintiff was demoted.

As discussed, under the terms of the job descriptions it is apparent that the two positions were not the same.  Also as discussed, Plaintiff has presented no evidence from which a trier of fact could reasonably determine that improving the Chapter's financial condition was not Ms. Taylor's goal in creating the CD/PR Officer position.  Additionally, the Public Support Specialist position was not eliminated by the creation of the CD/PR Officer; the Chapter hired a replacement for Plaintiff a couple of months after hiring the CD/PR Officer.

Even if the hiring of the CD/PR Officer altered Plaintiff's position, California law provides that an employer may reinstate an employee to a comparable position if the change is made for "legitimate business reasons unrelated to the employee taking a pregnancy disability leave."  2 Cal. Code Regs. 7291.9(c)(A). Here, as discussed supra, it is undisputed that the Chapter was having financial trouble and there is evidence that Ms. Taylor intended to improve the Chapter's financial situation by creating

the CD/PR Officer position.  More importantly, there is no
evidence that the development of the CD/PR Officer position was
related to Plaintiff's taking her pregnancy leave.  That
Plaintiff may have had to report to the new position does not
necessarily mean that she was demoted, so long as her position
was comparable.

The Public Support Position is not identical to the CD/PR
Officer position.  This is evidenced by the job descriptions and
the fact that both positions were subsequently filled by the
Chapter.  Plaintiff has presented no evidence on which a trier of
fact could reasonably find that the CD/PR Officer position
stripped Plaintiff of her duties or supporting her argument that
"Ms. Taylor's repeated statements that Ms. Jerkovich would be
able to return to her former position were empty statements that
Ms. Jerkovich knew would not be realized upon her return from
maternity leave."  Pl.'s Opp'n at 7.  Even if the new position
did alter the Public Support Specialist position, there is no
evidence that the redefined Public Support Specialist position
was not comparable to the original or that the alteration was not
done for the legitimate business reason of improving the
Chapter's financial state.

Defendants have presented sufficient evidence to demonstrate
no triable issue of material fact as to whether Defendants
offered to reinstate Plaintiff to the same or comparable position
upon her return from maternity leave.  Plaintiff has not carried
her burden of demonstrating a triable issue as to the

interpretation of the memo or as to the differences between the two positions in her department.  Defendants are entitled to summary judgment as to this aspect of Plaintiff's claim for failure to reinstate.

### c)  Did Defendants Refuse to Reinstate Plaintiff Within Two Business Days?

Plaintiff argues that Defendants violated the statute because Defendants failed to reinstate Plaintiff to her position within two business days.  The applicable regulation provides that an employer must reinstate an employee "within two business days, where feasible, after the employee notifies the employer of her readiness to return, to the same, or, where applicable, a comparable position . . .."  2 Cal. Code Regs. § 7291.9(b)(2).

Plaintiff's doctor cleared her for return to work on Wednesday, September 17, 2003.  It is undisputed that at the September 9 meeting, Ms. Taylor requested Plaintiff return on Monday, September 22, 2003, three business days later.[12]  Defs.' UMF No. 15.  Ms. Taylor was scheduled to be out of town from September 17-19 "for a banquet and meeting with the Red Cross' State Council."  Taylor Decl. ¶ 11.  Ms. Taylor avers that she

---

[12]  Plaintiff testified that she returned to work on September 17 partly because she had not received Ms. Taylor's request in writing.  Jerkovich Depo. 143:4-9.  Plaintiff returned to work in the early afternoon, id. at 171:21-24, consistent with her Wednesday schedule of working from 12-4.  The Federal Express package from Ms. Taylor, which contained the request in writing, was received at Plaintiff's home at 10:23 am on September 17th, before Plaintiff was scheduled to arrive at work.  Taylor Decl. Ex. F.

1   requested Plaintiff start on September 22 because she wanted to

2   be present when Plaintiff returned.  Defendants assert that it

3   was thus not feasible for Plaintiff to return to work until

4   September 22.  Ms. Burson acknowledged that, because Plaintiff's

5   office had been moved around, it would have been helpful for Ms.

6   Taylor to be present when Plaintiff returned so that Ms. Taylor

7   could give Plaintiff an "orientation" as to where Plaintiff's

8   files were and what changes had been made during Plaintiff's

9   pregnancy leave.  Burson Depo. 63:25-64:04.  Ms. Burson also

10  testified, however, that in her opinion it was not necessary for

11  Ms. Taylor to be present because Plaintiff was familiar with her

12  own job.  Burson Depo. 62:11-13.  Ms. Burson characterized Ms.

13  Taylor's request as "totally out of line."  Id. at 62:8.

14       Plaintiff does not dispute that Ms. Taylor was scheduled to

15  be out of town on September 17-19.  Pl.'s Reply to UMF No. 15.

16  Plaintiff argues that reinstatement on September 17 was

17  "completely feasible" because Ms. Taylor "miraculously

18  reappeared" on the 17th.  Pl.'s Opp'n at 9.  Ms. Taylor stated in

19  her declaration that her out of town trip was cancelled at the

20  last minute because she had to "attend a meeting of the Chapter's

21  Board of Directors and handle other pressing chapter business."

22  Taylor Decl. ¶ 14.  Plaintiff does not dispute this assertion.

23       Although neither party cites any case law regarding the

24  proper interpretation of the word "feasible" as used in the

25  statute, Defendants have offered admissible evidence that it was

26  not feasible in the administrative sense for Plaintiff to be

33

1   reinstated within two business days.  Ms. Taylor, Plaintiff's

2   supervisor, wanted to be present when Plaintiff returned from

3   pregnancy leave so that she could orient Plaintiff to the changes

4   in the office.  Plaintiff has offered no evidence supporting her

5   position that Ms. Taylor's schedule was not as she claimed;

6   sarcastic characterizations are insufficient.  Plaintiff has not

7   carried her burden with respect to this issue and Defendants are

8   entitled to summary judgment as to this aspect of Plaintiff's

9   claim for failure to reinstate.

10              **2.  Constructive Discharge**

11        Plaintiff argues in the alternative that Defendants violated

12   FEHA by constructively discharging her from her position.  The

13   California Supreme Court set forth the applicable standard for a

14   constructive discharge claim in <u>Turner v. Anheuser-Busch, Inc.</u>, 7

15   Cal. 4th 1238 (1994).  The court stated that "[c]onstructive

16   discharge occurs when the employer's conduct effectively forces

17   an employee to resign."  <u>Id.</u> at 1244-45.  The court explained:

18        In order to establish a constructive discharge, an
         employee must plead and prove, by the usual
19        preponderance of the evidence standard, that the
         employer either intentionally created or knowingly
20        permitted working conditions that were so intolerable
         or aggravated at the time of the employee's resignation
21        that ***a reasonable employer would realize that a
         reasonable person in the employee's position would be***
22        ***compelled to resign.***

23   <u>Id.</u> at 1251.  The court emphasized that this standard is an

24   objective one; Plaintiff must demonstrate that "a reasonable

25   person faced with the allegedly intolerable employer actions or

26   conditions of employment would have no reasonable alternative

                              34

except to quit."   Id. at 1248 (quotations omitted).  Although usually a question of fact, "in some situations a court may conclude as a matter of law that a reasonable employee would not have felt compelled to resign" and summary judgment is proper. Kovatch v. Cal. Casualty Management Co., Inc., 65 Cal. App. 4th 1256, 1267 (1998), *overruled on other grounds*, Aguilar v. Atl. Richfield Co., 25 Cal. 4th 826, 854 n.19 (2001).

### a) Plaintiff Has Standing

Defendants assert that Plaintiff's constructive termination claim "is pure speculation" because Plaintiff did not return to work.  Defs.' Reply at 4.  To the extent that this could be construed as an argument that Plaintiff lacks standing to assert a claim, it is incorrect.  If a threatened injury is "certainly impending" it may constitute an injury in fact sufficient to establish standing.  15 Moore's Federal Practice §101.40[7][a] (Matthew Bender 3d ed.) (citing McConnell v. Federal Election Comm'n, 540 U.S. 93, 157 L. Ed. 2d 491, 124 S. Ct. 619 (2003)). The injury here was, if not actualized during the short time Plaintiff did return to the office, "certainly impending."

### b) The Allegedly Intolerable Conditions

To be deemed intolerable an adverse working condition generally must be unusually "aggravated" or amount to a "continuous pattern."  Cloud v. Casey, 76 Cal. App. 4th 895, 902-03 (1999).  "The determination of whether a person was constructively discharged depends on the working conditions that person encounters."  Kovatch, 65 Cal. App. 4th at 1268 (citing

35

1   <u>Turner</u>, 7 Cal. 4th at 1244-47).  A plaintiff must show that she

2   was "personally exposed to the conduct, even if the conduct was

3   not directed at [her]."  <u>Id.</u>  "Incidents of offensive behavior"

4   happening outside the presence of the plaintiff or of which the

5   plaintiff was unaware until after her termination are disregarded

6   in evaluating the conditions, although they may be relevant to

7   the issue of animus.  <u>Id.</u>

8       Bearing this standard in mind, the "intolerable conditions"

9   as alleged by Plaintiff and refuted by Defendants are set forth

10  below.

11              **1)  Fact Number 1: Change in Status, Benefits**

12                  **& Salary**

13      It is undisputed that if Plaintiff were to return to her

14  position full time her salary would be unchanged.  The proposed

15  reduction in salary was to reflect Plaintiff's "new work

16  schedule" as set forth in the memo she and Ms. Hermanson signed.

17  As discussed, there is no evidence supporting the proposition

18  that the memo reflected a "flexible" schedule and merely set

19  forth Plaintiff's in-office availability; the memo speaks for

20  itself.  It is reasonable for an employer to prorate a salary to

21  reflect the hours to be worked.  Additionally, Red Cross policy

22  provides that only full time employees, defined as those working

23  40 hours a week, are eligible for paid benefits; Plaintiff does

24  not argue to the contrary.

25      The change in hours, which was requested by Plaintiff, does

26  not constitute an intolerable working condition.  The

corresponding changes in benefits and salary were the result of

the proposed change in Plaintiff's working hours.  These changes

do not constitute intolerable conditions.  See Lee v. Bank of

America, 27 Cal. App. 4th 197 (1994) (finding no constructive

discharge in case of salary reduction and change to position of

less responsibility).

### 2) Fact Number 2: Plaintiff's Not Being Able to Bring Her Baby to Work

The second condition is that Plaintiff was told by Ms.

Taylor at the August 27, 2003, meeting that she could not bring

her baby to work with her.[13]  Defs.' UMF No. 10.  It is

undisputed that the Chapter did not have a child care facility.

Defendants assert that it is also undisputed that the Chapter

"did not permit employees to bring children to work with them."

Id.

Plaintiff acknowledges that she did not have an agreement

with either Ms. Hermanson or Ms. Taylor that she would be allowed

to bring her baby to work with her.  Jerkovich Depo. 136:02-07.

Plaintiff also admits that no Chapter employees brought their

infant or toddler aged children to work.  Jerkovich Depo. 134:05-

06.  Plaintiff nonetheless argues that employees were allowed to

bring their children to work with them.  Plaintiff asserts that

---

[13]  It does not appear from the record that Plaintiff attempted
to bring her child to work and was refused; it is questionable
whether this was a condition Plaintiff actually encountered.
However, to the extent Plaintiff argues that the instruction was a
condition, it was encountered.

unspecified employees brought their children to work to help with volunteer projects, Jerkovich Depo. 133:17-18, and Ms. Burson recalls "a couple of instances where the director of health and safety had his two children in his office for several hours." Burson Depo. 54:19-21.

Neither Plaintiff's nor Ms. Burson's assertions refute Ms. Taylor's assertion that the Chapter did not, as a general rule, permit employees to bring their children to work.  That a director brought his children in on a couple of occasions does not establish that Chapter management allowed children to be brought to work on a regular basis.  Not allowing infants in a workplace without a childcare facility is not an intolerable condition.[14]

### 3) Fact Number 3: Changed Office Location

At the September 9 meeting, Plaintiff was informed that she "would no longer be working in the private office [she] had used, but would instead be working at a desk in the hallway and [her] former office would be occupied by the person selected in the newly created job position."  Jerkovich Decl. ¶12.  Ms. Burson's testimony indicates that the reason behind the move was so that Ms. Taylor could "keep an eye" on Plaintiff.  Burson Depo. 101:13-15.  Even if that was the motivation behind the move,

---

[14]  Although not a basis for this decision, it is noteworthy that Plaintiff's proposed work schedule provided that she would not work on Monday and Wednesday mornings so that she could care for her child while her spouse taught photography classes.  Jerkovich Decl. ¶ 7.  This undermines the assertion that Plaintiff intended to bring her baby with her to work.

1  Plaintiff has presented no case law suggesting that moving an
2  employee's work location either to more closely supervise the
3  employee or to accommodate staffing changes is an intolerable
4  condition.  Moving an employee's work location is not a condition
5  that would make a reasonable employee feel that they had no
6  alternative other than to quit.[15]

### 4) Fact Number 4: Use of Computer Room for Lactation

9   The other condition was that Plaintiff would have to use a
10  computer room to express her breast milk during the day as she no
11  longer had a private office.  Ms. Taylor had a lock installed on
12  the door of the room to guarantee Plaintiff's privacy.  Taylor
13  Depo. 161:18-22.  Plaintiff asserts that it was "a tiny room,
14  filled with computer equipment and was far from sanitary."
15  Jerkovich Decl. ¶ 17.  This assertion is conclusory.  There is no
16  indication that Plaintiff inspected the room upon her return to
17  the office and found it unsuitable.  Additionally, there is no
18  evidence that Plaintiff actually encountered this condition, i.e.
19  attempted to use the room, and it would be proper for this
20  condition to not be considered.  See Kovatch, 65 Cal. App. 4th at
21  1268.  Plaintiff was provided a secure and private place for her
22  lactation needs; even if less than ideal, this accommodation

---

24  [15]  Ms. Taylor testified that the Public Support Specialist was
moved into the hallway until a storage room could be converted into
an office.  In January 2004 the office was complete and the new
25  Public Support Specialist moved into it in February.  Taylor Depo.
160:7-16.  There is no evidence, however, that the temporary nature
26  of the situation was communicated to Plaintiff.

would not prompt a reasonable employee to believe that her only option was to quit.

### 5) Fact Number 5: Change in Plaintiff's Position / Altering Chain of Command

Plaintiff asserts that it was "clear" to her that the CD/PR Officer would have "virtually all of the duties, responsibilities and functions that [Plaintiff] previously had." Jerkovich Decl. ¶ 17. Plaintiff further asserts that if she were to return to work, "whether part-time or full-time, I would merely be an assistant, which is work that could be easily performed by our non-paid interns and volunteers . . . I could not return to this work environment." Id.

The CD/PR Officer position was vacant when Plaintiff went to work on September 17 for approximately an hour. As Plaintiff did not return to work for any appreciable amount of time, it is unlikely that Plaintiff sufficiently encountered the condition of having her job duties changed and having to work within the new office organizational structure for it to constitute an intolerable condition under Kovatch. Assuming, arguendo, that Plaintiff did encounter this condition, the two positions, as discussed, are separate and distinct, although not without their similarities. Additionally, there is no evidence to support Plaintiff's contention that she was demoted. Moreover, even if the altered work environment were considered a demotion and / or a condition, California courts have held that a demotion, even if accompanied with a reduction in pay and responsibility, is not by

40

itself an intolerable condition.   <u>See</u> <u>Turner</u>, 7 Cal. 4th at 1247.

Plaintiff cites no case in which conditions such as the ones she encountered were deemed intolerable.   In contrast, the Ninth Circuit found no constructive discharge in <u>King v. AC&R Advertising</u>, 65 F.3d 764 (9th Cir. 1995), in which the plaintiff sued when his employment was changed to be "at will," his salary was reduced from $235,000 to $175,000 and his bonus structure was changed.   The court found the plaintiff's resignation "unreasonable as a matter of law" because the plaintiff failed to show that the conditions were "so unusually adverse that a reasonable employee in [his] position would have felt compelled to resign."   <u>Id.</u> at 769.   Further, the California Supreme Court has acknowledged that "[e]very job has its frustrations, challenges, and disappointments; these inhere in the nature of work.   An employee is protected from . . . unreasonably harsh conditions, in excess of those faced by his [or her] co-workers. He [or she] is not, however, guaranteed a working environment free of stress."   <u>Turner</u>, 7 Cal. 4th at 1247.

Here, Plaintiff's resignation, even assuming she encountered all the alleged conditions, was unreasonable as a matter of law. No reasonable employee would believe that a change in duties and organizational structure, an office relocation, a no-child policy and a change in salary/benefits commensurate with an employee's own proposed work schedule would be intolerable.   Although these changes may have been disappointing or annoying to Plaintiff, they were not "unusually adverse" or "unreasonably harsh."

41

1    **c) Nexus With Plaintiff's Protected Status**

2    Defendants argue that there is no evidence that Ms. Taylor's

3    actions were based on Plaintiff's pregnancy.  Constructive

4    termination requires a nexus between the termination and the

5    employee's protected status or activity.  Turner, 7 Cal. 4th at

6    1258-59; Tameny v. Atlantic Richfield Co., 27 Cal. 3d 167, 174-76

7    (1980).  Assuming, arguendo, that the facts regarding

8    discriminatory animus are sufficient, without any intolerable

9    conditions there can be no constructive discharge and this

10   portion of claim three need not be discussed further.

11   Defendants' request for summary judgment as to Plaintiff's

12   claims that Defendants failed to reinstate her and that she was

13   constructively discharged is hereby GRANTED.

14   **B.  Claim Two - Discrimination**

15   Plaintiff's second claim is for general discrimination based

16   on her pregnancy.  Prior to the 2004 amendment, Government Code

17   section 12945 provided that it was unlawful for an employer

18   discriminate against an employee due to pregnancy, childbirth, or

19   a related medical condition "in compensation or in terms,

20   conditions, or privileges of employment."  Plaintiff asserts that

21   after the amendment, which deleted this language, employment

22   discrimination based on pregnancy was subsumed within the general

23   provision of section 12940.  Section 12940 makes it unlawful for

24   an employer to discriminate based on, *inter alia*, physical

25   disability or medical condition.  Cal. Govt. Code § 12940(a).

26   Neither party makes a legal argument or presents any case

42

law regarding this issue.  Rather, Plaintiff asserts that "based on the facts previously stated, that Ms. Taylor intentionally discriminated against the plaintiff because of her pregnancy and made conditions so intolerable that she was unable to return to work."  Defendants, in turn, argue that Plaintiff has not addressed her second claim and that, because it is based on the same facts as the first, summary judgment is appropriate.

It is apparent from Plaintiff's description of claim two - that Ms. Taylor "made conditions so intolerable that [Plaintiff] was unable to return to work" - that claim two is alleges a constructive discharge claim.  Claim two is redundant of the constructive discharge component of claim one; summary judgment is hereby GRANTED in favor of Defendants as to claim two.[16]

### C.  Claim Three - Retaliation

Plaintiff's third claim is for pregnancy discrimination under FEHA based on her not being selected for the CD/PR Officer position.  Plaintiff argues that "Ms. Taylor was angry with Ms. Jerkovich for not accepting part time employment, and granted Ms. Jerkovich an interview for the new position with no real intention of hiring her."  Pl's Opp'n at 12.

#### 1. Legal Standard

Plaintiff does not challenge the legal standard as set forth by Defendants, which is for discriminatory failure to promote

---

[16]   The joint pretrial statement filed by the parties states that Plaintiff is proceeding under the following three legal theories: failure to reinstate, constructive discharge and a FEHA violation for failure to promote.  <u>See</u> Doc. 43 at 8.

43

1  rather than retaliation.[17]  To state a claim for discrimination,

2  Plaintiff will have to demonstrate that Defendants discharged or

3  took adverse employment action against Plaintiff based on her

4  pregnancy or childbirth related condition.  Cal. Govt. Code §

5  12940.  California courts apply a three-stage burden-shifting

6  test in interpreting FEHA employment discrimination claims.  Guz

7  v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 354 (2000) (discussing

8  the Supreme Court's McDonnell Douglas test).  At trial, the

9  initial burden is on the plaintiff to establish a prima facie

10 case of discrimination.  Id.  This generally consists of showing

11 that the plaintiff 1) was a member of a protected class, 2) was

12 qualified for the position sought, 3) suffered an adverse

13 employment action, such as denial of a job, and 4) "some other

14 circumstances suggests discriminatory motive."  Id. at 355.  The

15 court explained that:

16     [Plaintiff] must at least show "actions taken by the
        employer from which one can infer, if such actions
17      remain unexplained, that it is more likely than not
        that such actions were 'based on a [prohibited]
18      discriminatory criterion . . ..'"

19 Id.  Similarly, this Court, in Phipps v. Gary Drilling Co., 722

20 F. Supp. 615, 619 (E.D. Cal. 1989), stated that "the prima facie

21 case must be supported by evidence that gives rise to an

22 inference of unlawful discrimination."  The failure of a

23

24     [17] The discrimination standard is more appropriate here as a
       claim for retaliation under FEHA section 12940(h) requires that a
       plaintiff be retaliated against for opposing an employer's unlawful
25     practices, filing a complaint or otherwise reporting a FEHA
       violation.  Cal. Govt. Code § 12940(h).  There is no allegation
26     here that Plaintiff filed a complaint or reported a FEHA violation.

1  plaintiff to produce "specific facts" that establish a prima

2  facie case renders summary judgment appropriate.  Id.

3       If the plaintiff establishes a prima facie case there is a

4  presumption of discrimination.  Guz, 24 Cal. 4th at 355.  The

5  burden then shifts to the defendant to produce evidence that the

6  action was "taken for a legitimate, nondiscriminatory reason."

7  Id. at 355-56.  If the defendant satisfies this burden, the

8  plaintiff must offer evidence of the defendant's discriminatory

9  or pretextual motive.  Id. at 356.

10      The California Supreme Court noted in Guz, 24 Cal. 4th at

11  356-57, that California appellate courts have used varying

12  approaches to this test at the summary judgment stage, where the

13  initial burden is on the moving party.  See Fed. R. Civ. P. 56.

14  The Guz court did not decide the issue, but it appears that

15  summary judgment may be appropriate if Defendants 1) demonstrate

16  an absence of evidence to support Plaintiff's prima facie case

17  and Plaintiff does not present evidence supporting it; or 2)

18  present a legitimate non-discriminatory motive for their actions

19  and Plaintiff fails to produce affirmative evidence supporting a

20  rational inference of intentional discrimination.  Muzquiz v.

21  City of Emeryville, 79 Cal. App. 4th 1106, 1116-17 (2000).

22            **2.  Plaintiff's Prima Facie Case**

23                 **a) Protected Status, Qualifications & Adverse**

24                 **Employment Action**

25      Plaintiff, as a pregnant woman or a woman disabled by

26  pregnancy, is a member of a protected class as defined by FEHA.

45

Plaintiff was also subject to an adverse employment action in that she was not chosen for the CD/PR Officer Position.  These elements of Plaintiff's prima facie will be assumed for purposes of this motion.

Defendants argue that Plaintiff cannot establish a prima facie case for discrimination based on failure to promote because Plaintiff cannot demonstrate that she was qualified for the CD/PR Officer position and reasonably expected to receive the promotion.  The preferred qualifications were a minimum of five years of leadership experience in fund raising and public relations, a minimum of three years of management experience, excellent written and verbal communication skills, and bilingual ability in English and Spanish.  Ms. Taylor acknowledged that she considered these to be "preferences to the extent that the Chapter might not find a candidate possessing every stated qualification."  Taylor Decl. ¶ 22.  Defendants also argue that Plaintiff has no evidence showing any improper discriminatory animus by Ms. Taylor based on Plaintiff's protected status.  As discussed, Ms. Taylor's intent behind creating the position was to remedy the Chapter's poor economic condition.

Defendants argue that Plaintiff is not bilingual and lacked both the five years of leadership experience and the three years of management experience.  Plaintiff argues in response that bilingual ability was not necessary to the job because "Ms. Burson denies that Spanish fluency was necessary for the position, which is supported by the fact that Ms. Jerkovich had

1  been performing the job successfully for a year and a half."
2  Pl.'s Opp'n at 13.   In addition to being circular, this reasoning
3  is based on testimony that lacks foundation.   As mentioned, Ms.
4  Burson was not the Chapter's executive director and was not
5  involved in the development of the new position.   There is no
6  evidence indicating that Ms. Burson had the knowledge or
7  experience to determine what the qualifications for the CD/PR
8  Officer position should be.   In contrast, Ms. Taylor averred that
9  the reason she wanted a person with bilingual ability was to
10  better address the needs of the large Spanish-speaking population
11  in the Fresno area.   Taylor Decl. ¶ 23.

12      Plaintiff also argues that she was qualified for the CD/PR
13  Officer position because it was identical to the Public Support
14  Specialist position she had previously been performing.   As
15  discussed, the positions are different; the CD/PR Officer is a
16  management position concerned with development and long term
17  strategy while the Public Support Specialist position is a hands-
18  on position not focused on development.

19      It appears that Plaintiff may have been qualified for the
20  position in that she was familiar with the organization and
21  Plaintiff, unlike Ms. Martinez, had some fund raising experience.
22  Plaintiff did, however, lack management experience and is not
23  bilingual.   The inquiry here is not whether Plaintiff was a
24  better choice than Ms. Martinez, but whether Plaintiff was
25  qualified.   It will be assumed for purposes of this motion that
26  Plaintiff was qualified for the position.

47

**b) Discriminatory Animus**

Where Plaintiff's prima facie case fails is in the area of discriminatory motive.  There is no evidence that Ms. Taylor's actions were related to Plaintiff's pregnancy.  It is undisputed that Plaintiff never heard any derogatory comments regarding pregnant women during the course of her employment with the Chapter.  Defs.' UMF No. 28.

Plaintiff argues that "Ms. Jerkovich was not considered for the position because *Ms. Taylor was angry with Ms. Jerkovich over the dispute that arose between them* over her return from maternity leave."  Pl.'s Reply to UMF No. 35 (emphasis added).  This assertion is unrelated to Plaintiff's protected status; Plaintiff does not argue that she was not promoted because she was pregnant, took pregnancy leave or had a child.  Ms. Taylor's motivation, as characterized by Plaintiff, was anger over the disagreement regarding the memo, and there is no evidence that the dispute regarding the memo was related to Plaintiff's protected status.  To the extent Plaintiff relies on Ms. Burson's testimony to support her contention that Ms. Taylor was "angry" with Plaintiff, there is no factual foundation for Ms. Burson's opinion.  She was not privy to any of the email communications between Ms. Taylor and Plaintiff such that she could assess Ms. Taylor's attitude regarding the communications.

There is also no evidence that the Chapter generally was biased against pregnant employees, employees who take pregnancy leave or employees with children.  Ms. Martinez herself is a

48

mother with young children.  Similarly, nothing in the record
indicates such bias on the part of Ms. Taylor.  The two instances
that might even be considered in the inquiry are that Ms. Taylor
hoped that Plaintiff would want to be a full time mother, which
does not indicate a bias based on pregnancy, especially given
that the person chosen for the position had children, and that
Plaintiff did not express interest in the Chapter's affairs while
she was on pregnancy leave.  This last assertion, while perhaps
inappropriate as Plaintiff was not required to work while on
pregnancy leave, does lead to a rational inference of intentional
discrimination and does not, without more, carry Plaintiff's
burden in defeating summary judgment.

     That Ms. Taylor's comments do not indicate discriminatory
animus is evident when the facts of this case are compared with
cases in which pregnancy discrimination was found.  In Carr v.
Barnabey's Hotel Corp., 23 Cal. App. 4th 14, 20 (1994), for
example, there was evidence that the manager stated to the
plaintiff, a pregnant woman, that the hotel's kitchen "was no
place for a pregnant woman to be."  The manager also "told other
employees that pregnant women should not be working in the hotel
or restaurant business, and that 'it didn't look good' to have a
pregnant woman  at the front desk where [the plaintiff] worked."
Id.  Here, there are no comparable instances indicating that any
of the actions taken by the Chapter were motivated by Plaintiff's
having been pregnant or taken pregnancy leave.

     Although Plaintiff may have been qualified for the CD/PR

49

Officer position, there is no evidence of discriminatory motive supporting the assertion that Plaintiff was not selected based on her protected status.  Plaintiff cannot establish a prima facie case of failure to promote.

### b) Legitimate Nondiscriminatory Motive

Assuming, arguendo, that Plaintiff could establish a prima facie case, summary judgment may still be appropriate if Defendants show a legitimate nondiscriminatory motive for not hiring Plaintiff.  Plaintiff may then avoid summary judgment only by demonstrating by specific and substantial evidence that the nondiscriminatory motive was pretext for discrimination.

Defendants assert that Ms. Martinez was selected because her qualifications were superior to Plaintiff's.  Tom Jones, the management consultant who sat in on the interviews, found that Ms. Martinez was better suited for the job based on her "education, her experience, her demeanor during the interview, her eagerness, [were] just different than any other person." Jones Depo. 32:17-19.  Mr. Jones concluded that Ms. Martinez was well suited for the CD/PR Officer position based on "her experience in the bay area, the companies she worked for, the things she did." Id. at 33:22-23.  He stated that Ms. Martinez's superiority as a candidate "wasn't so much fund raising, it was her involvement with community people outside the organization she worked for, community relations." Id. at 34:1-3.

Comparing the resumes of Ms. Martinez and Plaintiff yields the following distinctions.  As to education, Ms. Martinez

50

graduated with her bachelor's from Harvard with honors and has a master's degree from University of California Berkeley; Plaintiff graduated with her bachelor's from Cal State Fresno with no distinction.  As to experience, Ms. Martinez has two years of management experience; Plaintiff has none (the preference was for 3 years).  Ms. Martinez has at least four years of experience in what could be considered a "leadership position" versus Plaintiff's two years.  Ms. Martinez is bilingual; Plaintiff is not.  The only qualification Ms. Martinez was lacking was fund raising, in which Plaintiff had approximately two years of experience.  Nevertheless, Ms. Martinez did have experience with large budgets.  On the whole, Ms. Martinez's resume quite closely matched the qualifications preferred by the Chapter.

Given Mr. Jones' recommendation and Ms. Martinez's resume, Defendants have demonstrated a legitimate nondiscriminatory reason for hiring Ms. Martinez over Plaintiff.

### c) Pretext

As Defendants had a legitimate nondiscriminatory reason for not hiring Plaintiff, that another candidate more closely met the preferred qualifications, Plaintiff can avoid summary judgment only by producing affirmative evidence supporting a rational inference of intentional discrimination.  Muzquiz, 79 Cal. App. 4th 1116-17.  As discussed with respect to Plaintiff's prima facie case, there is no such evidence.

Accordingly, even if Plaintiff were qualified for the position, Defendants had a legitimate nondiscriminatory reason

1  for hiring Ms. Martinez and there is no evidence that the

2  proffered nondiscriminatory reason was pretextual.  Defendants'

3  request for summary judgment is GRANTED as to claim three.

4      **D.  Claim Four - Violation of Public Policy**

5      Plaintiff's fourth claim for termination in violation of

6  public policy is based on the same facts as Plaintiff's other

7  claims.  Defendants argue that Plaintiff cannot establish a claim

8  for constructive termination based on a statute and therefore,

9  under Turner, 7 Cal. 4th at 1256-57, Plaintiff cannot state a

10  common law claim for termination in violation of public policy.

11      California law supports a claim for pregnancy discrimination

12  outside the confines of FEHA.  In Badih v. Myers, 36 Cal. App.

13  4th 1289, 1296 (1995), the California Court of Appeal held that

14  "pregnancy discrimination is a form of sex discrimination under

15  article I, section 8 of the California Constitution" in finding

16  that an employer to whom FEHA was not applicable could still be

17  liable for wrongful termination based on pregnancy.

18      Plaintiff, however, does not address the fourth claim in her

19  opposition.  Failure to oppose a claim on a motion for summary

20  judgment may constitute a waiver of that claim.  See Coufal

21  Abogados v. AT&T, Inc., 223 F.3d 932, 937 (9th Cir. 2000); Doe v.

22  Benicia Unified Sch. Dist., 206 F. Supp. 2d 1048, 1050 n.1 (E.D.

23  Cal. 2002).  Additionally, as mentioned, supra n.16, the parties

24  set forth three legal theories in their joint pretrial statement,

25  and a theory arising under the California Constitution was not

26  among them.  Finally, even if Plaintiff were attempting to state

1  a claim for termination in violation of public policy rather than

2  statutory policy, this claim is redundant of the constructive

3  termination claim on which Defendants are entitled to summary

4  judgment.  Defendants' request for summary judgment is GRANTED as

5  to claim four.

6      **E.   Punitive Damages**

7      Defendants argue that if summary judgment is not granted as

8  to all of Plaintiff's claims, then summary adjudication is

9  appropriate as to the issue of punitive damages.  As summary

10 judgment is appropriate in this case, the issue of damages need

11 not be addressed.

12 **V.   Conclusion**

13     Defendants sufficiently carried their burden as the moving

14 party on a motion for summary judgment.  Plaintiff has failed to

15 produce "significant probative evidence tending to support the

16 complaint."  <u>T.W. Elec.</u>, 809 F.2d at 630.

17     **ACCORDINGLY, IT IS ORDERED** that Defendants' motion for

18 summary judgment is hereby GRANTED.

19     **FURTHER ORDERED** that summary judgment be entered in favor of

20 Defendants.  The clerk shall close the case.

21

22 IT IS SO ORDERED.

23 **Dated:  <u>August 22, 2005</u>              <u>/s/ Robert E. Coyle</u>**
   ia40ij                                UNITED STATES DISTRICT JUDGE

24

25

26